UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
UNITED STATES IMMIGRATION COURT
Boston, Massachusetts

File Nos.:   A 76 117 960 (Lead respondent)                July 27, 2000
             A 70 868 672

In the Matter of

| | | |
|---|---|---|
| MOURCOUS MORGAN MORGAN,<br>    Lead Respondent<br>IBRAHIM EREIN MANSOUR<br>    Respondent | ) ) ) ) | IN REMOVAL PROCEEDINGS |

CHARGE:      237(a)(1)(B) after admission as a non-immigrant
             visitor remained longer than permitted

APPLICATIONS: Asylum; withholding of removal; relief under
              Article 3 of the Convention Against Torture; and
              voluntary departure, in the alternative

ON BEHALF OF RESPONDENTS:                ON BEHALF OF SERVICE:

Saher Joseph Macarius, Esquire           Patricia Flanagan, Esquire
209 West Central Street,                 Assistant District Counsel
Suite 127                                JFK Federal Building
Natick, Massachusetts 01760              Room 425
                                         15 New Sudbury Street
                                         Boston, Massachusetts 02203

ORAL DECISION OF THE IMMIGRATION JUDGE

    The respondents herein are a married couple. The lead respondent is the male respondent. He is a 27-year-old native and citizen of Egypt. His wife is a 26-year-old native and citizen of Egypt. Removal proceedings were instituted against when the Immigration and Naturalization Service issued a Notice to Appear on March 10, 2000 and served it by mail on March 27, 2000, filed it with the Immigration Court at Boston, Massachusetts on March 29, 2000. Group Exhibit 1. By way of

JAN 1 9 2001

MS

these documents, the Service contends that the respondents are removable on the charge stated above.

The respondents, through counsel, submitted pleadings. Exhibit 2 in each of the respondents cases. In the pleadings the respondents admit factual allegations one through four and concede removability. Based on the evidence of record as well as the admissions of respondents and concession of removability in each of their pleadings, I find that removability has been sustained by evidence that is clear and convincing in each of their cases.

In each case the respondents declined to name a country for removal purposes should the respondents' removal be required. The Court has named Egypt as the country for removal purposes in each of their cases.

The male respondent filed an application for asylum with the Immigration and Naturalization Service on February 24, 1999. His date of entry into the United States was September 23, 1998. His application is timely. The application was filed prior to his marriage and while the person who was to become his wife was still in Egypt.

The female respondent entered the United States on July 2, 1999 and the couple married on July 19, 1999 in Rhode Island.

The lead respondent's wife appears to have been added to the application at the time of the interview before the Immigration and Naturalization Service as there are corrections

MS

noted on the male respondent's application that seem to have been made at the time of the interview. I do consider that the wife has joined in her husband's application. The application for asylum was referred to this Court. See Group Exhibit 1. The respondents seek asylum, withholding of removal, and relief under Article 3 of the Convention Against Torture as well as voluntary departure, in the alternative.

Concerning asylum, I take into consideration the lead cases on asylum such as <u>INS v. Elias-Zacarias</u>, <u>INS v. Cardoza-Fonseca</u>, in the First Circuit, <u>Gebremichael v. INS</u>, other Board cases such as <u>Matter of Acosta</u>, <u>Matter of Mogharrabi</u>, <u>Matter of S-P-</u>, <u>Matter of Y-B-</u> and other lead cases.

The male respondent testified on behalf of his application. The female respondent did not testify. I will refer to the male respondent as "lead respondent." I do note at the outset that the male respondent did speak at times in generality such as "I was persecuted." I did urge him to give the Court specific facts concerning his situation and he did do so. I note that his affidavit also contains somewhat hyperbolic language. Factoring that in, I find that the male respondent was essentially credible when giving a factual account of events that occurred in Egypt. I do not necessarily find the respondent's conclusions or his assertions concerning motive and basis to be always credible.

The respondent testified. He indicated that he grew up

VMS

in Alexandria, Egypt. That he is a Coptic Christian. His wife is also Coptic Christian.

The respondent indicated that there are approximately 10 million Coptic Christians in Egypt with the remaining population being Muslim. Clearly, this isn't a religious minority in Egypt. The male respondent testified that he went in school as far as the school of law but in the test in his last year he did not pass four of his subjects. The respondent apparently came to the United States soon after ending his student days. He is a young man. He arranged for the person he intended to marry to come to the United States as well and they were married here within about a week or two of her arrival. They are both very young, 26 and 27 years of age.

The respondent testified that he suffered indignities through his schooling at the hands of the teachers. One certainly cannot condone such activity but it does not appear to this Court that anything that he suffered rises to a level of persecution under the Immigration and Nationality Act. The respondent contended, however, that "My teachers persecuted me."

The respondent also referred to an event that occurred in approximately the summer of 1992 on two successive Sundays when he was bringing children to the church and some other children were taunting the children in his charge, and later began to throw rocks. The respondent urged the children in his charge not to return fire, so to speak, and apparently the matter

A 76 117 960                         4                      July 27, 2000

VMS

ended. The children were taken into the church safely. The respondent also stated on at least on of the Sundays one of the rocks hit the bus' back windshield and broke it.

The respondent then testified that in the New Year 1997 that it's the custom to throw water balloons and also firecrackers on New Year's Eve, and that one of the people who had apparently attended the Coptic Christian service for that late evening on New Year's Eve, early morning of New Year's Day, was walking with a group of people leaving the service and saw that a girl was hit by a water balloon on her head. Respondent assumed that this was perpetrated by Muslims. It may well have been. However, New Year's Eve celebrations can be rowdy in many places and this, at any rate, did not appear to harm the respondent specifically.

There was also a matter concerning obtaining a permit to rebuild the roof of the church. This began in 1993. The church Father urged his parishioners to expand the church secretly. Some of the parishioners did help with this. They then were visited by the building inspectors and the police, who inquired about the work that was being done. Respondent was arrested with 13 others and was held for one night and released. The facility in which he was held does appear to have been quite severe but he was held just one night and released. Everyone seemed to have been released except for one Professor Yonan, who was held for 15 days. The is the gentleman, according to the

A 76 117 960                                5                                July 27, 2000

7MS

affidavit, who was in his upper 60s. He was released on bail and then went on a church trip during which time he suffered a heart attack and died. Apparently the court did not realize that he had died. Why the court was not informed that was never made clear, but apparently he was sentenced to some imprisonment time.

Respondent also detailed his efforts to convince a Christian friend of his not to continue her romantic relationship with a Muslim male. The male apparently contacted him and was very upset that he had been part of convincing the friend to break off the relationship with him. In my opinion, the Muslim male appeared to be justified in his being upset that the woman whom he cared about and who chose to be romantically involved with him was persuaded not to continue the relationship. Whether other actions on the part of the Muslim man, or at least that attributed to him or at least at his instigation, were justified is another matter. I would never condone physical violence but it does appear that some of the man's compatriots or friends did meet the respondent on the street and roughed him up a bit. They apparently did not use the weapons that they had in their possession but the respondent claimed that he was hit with a cinder block.

The respondent's account to the police is very telling. He did not want to tell the police that he had in fact been involved in persuading the young woman in question not to pursue her relationship. The respondent feels that he is justified in

/MS

persuading the woman otherwise. He may feel that strongly. However, it does not appear to me that there is a prohibition against the young woman being romantically involved with whomever she wishes to be involved with. In my opinion, the respondent is misguided in his efforts to "save the Christian woman from the Muslim man." This constitutes the respondent's essential asylum claim.

The respondent claims that his father was hit by a speeding car, that the driver was a Muslim. The respondent claims that the young Muslim man who felt wronged took credit for the event after the fact. The Muslim man may or may not have had anything to do with it. It may have been the convenience way to "up the ante" in this personally dispute. I do consider the matter to be a strictly personal dispute, although there are shadings of religion involved because the principals were Christian and Muslim.

The respondent has not shown why he cannot live elsewhere in the country. The respondent did not explain why he did not apply for asylum at the Embassy. He has not explained to this Court why he has circumvented the orderly refugee process both in his own case and encouraging his fiancee to come to the United States where they married. She also obtained a visa through the Consul for the United States. I find that the respondent's claim does not in any way meet his burden for asylum. I note that the Department of State has issued a report

/MS

on international religious freedom at Exhibit 4 it is for 1999, and it does refer on page 3 of 7, middle paragraph, to the government issuing an increased number of building permits. It does refer to during the 1990s. The Country Reports, also at page 17 of 28, gives the same information at the last paragraph, during the 1990s the government increased the number of building permits issued to Christian communities and some of these were for new construction, for new churches. And apparently issued permits retrospectively for churches that had been constructed without authorization. As respondent's counsel notes, however, that there is still in effect an Ottoman decree of 1856 and that non-Muslims must obtain what is a presidential decree to build a place of worship. This information indicates that it may indeed be difficult to obtain permits but it is possible. And although we do not know exactly when in the 1990s the government increased the number of building permits as respondent's counsel rightly points out, it does appear that at this time in the year 2000 that that has eased and also it appears that that situation was easing as the respondent came to the United States in late 1998. The Country Reports are for 1999 which is almost two months from the date that the respondent came to the United States.

It appears to me that in this situation, the respondent finished his student days, perhaps unsuccessfully by not passing his law requirements. He obviously had a young woman in mind for marriage and decided to come to the United States to build a

/MS

better life. I understand that many people wish to do that throughout the world, however, that is not sufficient reason to come to the United States without the benefit of an immigrant visa. I do understand the situation of Coptic Christians in Egypt and I have granted a good number of asylum cases to Coptic Christians in Egypt. However, in this case, the details are so minimal as to render the claim essentially baseless.

Because the respondents cannot meet the more generous well-founded fear standard for asylum, they cannot meet the more stringent standard for withholding of removal under <u>INS v. Stevic</u>.

The respondents can in no way show relief under Article 3 of Convention Against Torture. There's been no past torture at the hands of the government for either respondent as that term is defined in Article 3 of the Convention Against Torture nor is there any likelihood that there will be torture in the future.

Concerning voluntary departure for the male respondent, he has been in the United States for longer than one year prior to the service of the Notice to Appear. However, his passport expired in 1999 and, therefore, he cannot show an unexpired valid travel document enabling him to enter the country to which he is destined at the conclusion of the merits hearing. He is, therefore, statutorily ineligible for voluntary departure.

Concerning voluntary departure for the female respondent, her passport is valid until 2005, however, she had

/MS

not been in the United States for one year before the service of the Notice to Appear. Therefore, she is not statutorily eligible for voluntary departure at the conclusion of the merits hearing. I must deny voluntary departure to both because they are not statutorily eligible.

## ORDER

The respondents' applications for voluntary departure and withholding of removal be and the same are hereby denied.

IT IS FURTHER ORDERED that respondents' applications for relief under Article 3 of the Convention Against Torture be and the same are hereby denied.

IT IS FURTHER ORDERED that respondents' applications for voluntary departure be and the same are hereby denied.

IT IS FURTHER ORDERED that respondents be removed and deported to Egypt on the charges in their respective Notices to Appear.

PATRICIA SHEPPARD
United States Immigration Judge